IN UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK


▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

PASHA PROBIV

                                               Complaint for a Civil Case

         **Plaintiffs,**                               **Case No: 22-CV-02907-HG-JRC**

         **-against-**

PAYCARGO LLC,
EDUARDO DEL RIEGO,
XANDER LAW GROUP, P.A.,
and JASON WEBER

         **Defendants.**

---

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THIS CASE FOR FAILURE TO STATE CLAIM OR ALTERNATIVELY TO TRANSFER OR ALTERNATIVELY TO STRIKE PLEADINGS**

---

       Plaintiff hereby responds in opposition to Defendants' PayCargo, Eduardo del Riego, Jason Weber Motion to Dismiss (D.E. 21) and its Memorandum of Law ("Memorandum") (D.E. 22) and a Motion to Dismiss (D.E. 26) and its Memorandum of Law (D.E. 27) by Defendant Xander Law Group P.A.

       Plaintiff attaches the proposed amended complaint ("Compl2") (Exhibit 1 Amended Complaint) with cured deficiencies, along with the blackline copy of the amendments to the

complaint (Exhibit 2 AmendComplBlackline) as this court requested.

In the amended complaint Plaintiff dismisses without prejudice claims against Xander Law Group P.A., since this court would be unable to obtain jurisdiction over this Defendant. Plaintiff dismisses without prejudice Counts I, II, IV, and VII since the factual background doesn't fully support those claims and adds a claim of Malicious Prosecution as Count I.

Dismissal of Count I Federal RICO is reasoned by Plaintiff's evolving understanding of the federal law. Specifically, the thing of value that is extorted under the Hobbs Act needs to be transferrable. Plaintiff's economic opportunity to conduct business with a 3rd party is unique to Plaintiff and is not transferrable, therefore Defendants didn't extort Plaintiff, instead, they coerced Plaintiff. Coercion doesn't give rise to RICO claims.

Dismissal of Count II is reasoned by Defendants' conduct not being consumer-oriented and offending acts taking place outside of New York as Defendants' attorneys properly noticed in their Memorandum.

Dismissal of Count IV IIED is reasoned by the inability to recover damages for both Prima Facie Tort and IIED claims (see *Hughes v Patrolmen's Benevolent Assn*., 850 F2d 876, 878 [2d Cir 1988]).

Plaintiff dismisses without prejudice Count VII Fraud on Court since it needs to be brought up in the venue where the fraud occurred (see *Pandozy v Segan*, 518 F Supp 2d 550, 555 [SDNY 2007])

Plaintiff provides additional pleadings to support this court's jurisdiction over the remaining Defendants in its Compl2 ¶3,10,11,12. Plaintiff also lists some factual allegations in this Response hereunder with supporting evidence from the Exhibits, public sources, and *PayCargo vs. Galbreath* 1:20-cv-22885-KMW ("Fla. Action"):

2

## Table of Contents

TABLE OF AUTHORITIES .................................................................. 4

I. INTRODUCTION ....................................................................... 6

II. FACTUAL BACKGROUND ......................................................... 7

    II.A. A PATTERN OF REPEATED, INTENTIONAL LIES .................... 7

    II.B. OTHER FACTS ............................................................. 12

    II.C. LONG-ARM STATUTE AND MINIMUM CONTACTS ................. 13

    II.D. VENUE CONVENIENCE ................................................... 16

    II.E. KEY WITNESSES ......................................................... 16

    II.F. SPECIAL DAMAGES ...................................................... 16

III. LEGAL ARGUMENT ............................................................. 17

    III.A. LONG-ARM STATUTE ................................................... 17

    III.B. CONSTITUTIONALITY OF LONG-ARM STATUE ................... 18

    III.C. INSTANT ACTION CLAIMS ARE NOT COMPULSORY COUNTERCLAIMS ...... 19

    III.D. FLORIDA LITIGATION PRIVILEGE .................................. 24

    III.E. NOERR-PENNINGTON DOCTRINE .................................. 26

    III.F. FED. R. EVID. 408. COMPROMISE OFFERS AND NEGOTIATIONS .................... 28

    III.G. TWOMBLY PLEADING STANDARD ................................. 29

    III.H. MALICIOUS PROSECUTION IN CIVIL PROCEDURE ............ 29

    III.I. TORTIOUS INTERFERENCE .......................................... 30

    III.J. INJURIOUS FALSEHOOD ............................................... 32

    III.K. PRIMA FACIE TORT .................................................... 32

IV. CONCLUSION .................................................................... 33

Case No: 22-CV-02907-HG-JRC

## TABLE OF AUTHORITIES

**Federal Rules**

Fed. R. Civ. P. 13(a) .................................................................................................... 20

Fed. R. Evid. 408 ................................................................................................... 28, 29

**Statutes**

CPLR 302(a)(3) .................................................................................................... 17, 19

**Second Circuit**

Adam v. Jacobs, 950 F.2d 89 ........................................................................................ 21

Chloe v Queen Bee of Beverly Hills, LLC, 616 F3d 158 ........................................... 18

Clerveaux v. E. Ramapo Cent. Sch. Dist., 984 F.3d 213 ............................................ 29

Critical-Vac Filtration Corp. v Minuteman Intl. Inc., 233 F3d 697 [2d Cir 2000] ...... 22

Engel v. CBS, 145 F.3d 499 ........................................................................................ 30

Federman v Empire Fire & Mar. Ins. Co., 597 F.2d 798 ............................................ 19

Federman v. Empire Fire & Marine Ins. Co., 597 F.2d 798 ....................................... 20

Harris v Steinem, 571 F2d 119 .................................................................................... 20

Hughes v Patrolmen's Benevolent Assn., 850 F2d 876 ................................................. 2

Natl. Equip. Rental, Ltd. v Fowler, 287 F2d 43 .......................................................... 22

O'Brien v. Alexander, 101 F.3d 1479 .......................................................................... 30

**Eastern District of New York**

Aetna Cas. & Sur. Co. v Spartan Mech. Corp., 738 F Supp 664 ................................. 20

Full Circle United, LLC v. Skee-Ball, Inc., No. 11-CV-5476, 2014 U.S. Dist. LEXIS 202841 .. 24

Sadigh v Educ. Credit Mgt. Corp., 2022 US Dist LEXIS 142791 ............................... 28

Westwide Winery, Inc. v. SMT Acquisitions, LLC, 511 F. Supp. 3d 256 .................... 28

**Southern District of New York**

Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F. Supp. 3d 436 .......................... 32

Banque Indosuez v Trifinery, 817 F Supp 386 ............................................................ 21

Brown v. AXA RE., 2004 U.S. Dist. LEXIS 7624 ....................................................... 31

Conti v Doe, 535 F Supp 3d 257 ................................................................................. 24

Faiveley Transp. USA, Inc. v Wabtec Corp., 2011 US Dist LEXIS 52945 ................. 31

Case No: 22-CV-02907-HG-JRC

Giuffre v Maxwell, 2017 US Dist LEXIS 64405 ............................................................ 26

KGK Jewelry LLC v ESDNetwork, 2014 US Dist LEXIS 177137 ..................................... 20, 23

Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2, 419 F. Supp. 3d 668 .............................. 24

Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills, 701 F Supp 2d 568 ........................... 23, 26

Pandozy v Segan, 518 F Supp 2d 550 ............................................................................. 2

Sykes v. Mel Harris & Assocs., LLC, 757 F. Supp. 2d 413 ............................................ 24

## Western District of New York

DirecTV, Inc. v. Lewis, 2005 U.S. Dist. LEXIS 8187 .................................................. 27

Steak Umm Co., LLC v Steak 'Em Up, Inc., 2009 US Dist LEXIS 101357 .............................. 28

## Court of Appeals of New York

Front, Inc., 24 NY3d at 720 ........................................................................................ 25

Ingraham v Carroll, 90 NY2d 592, 596-597 ................................................................. 19

LaValle v Hayden, 98 NY2d 155 ................................................................................. 18

Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 N.Y.3d 586 ..................... 18

Penguin Group (USA) Inc. v. American Buddha, 16 N.Y.3d 295 ........................................ 17, 18

Williams v Beemiller, Inc., 33 N.Y.3d 523 .............................................................. 17, 18

## Supreme Court of New York

Arnon Ltd (IOM) v Beierwaltes, 125 AD3d 453 ............................................................ 31

Caldera Holdings LTD v Apollo Global Mgt., LLC, 2019 NY Slip Op 33734[U] ..................... 31

Cavallaro v Pozzi, 28 AD3d 1075 ............................................................................... 26

Chen v Guo Liang Lu, 144 AD3d 735 .......................................................................... 18

Flomenhaft v Finkelstein, 127 AD3d 634 .................................................................... 25

Halperin v Salvan (117 AD2d at 544) ......................................................................... 25

Lacher v Engel, 33 AD3d 10 ....................................................................................... 25

Lewis v Pierce Bainbridge Beck Price Hecht LLP, 2020 NY Slip Op 31594[U] ..................... 25

Nick v Schneider, 150 AD3d 1250 .............................................................................. 18

Pagliaccio v Holborn Corp., 289 AD2d 85 ................................................................... 31

Sexter & Warmflash, P.C. v Margrabe, 38 AD3d 163 ..................................................... 26

Weitz v Weitz, 85 AD3d 1153, 1153-1154 ................................................................... 18

## District of Connecticut

Case No: 22-CV-02907-HG-JRC

Passaro-Henry v Allstate Ins. Co., 2010 US Dist LEXIS 132478 ................................................ 24

Shouq v. Norbert E. Mitchell Co., Inc., No. 18-cv-293, 2018 U.S. Dist. LEXIS 148001 ........... 29

Southern District of Florida

Coihue LLC vs. PayAnyBiz, LLC (1:17-cv-24062) ...................................................... 12

PayCargo vs. Galbreath 1:20-cv-22885-KMW ............................................................. 2

Tenth Circuit

Cardtoons, L.C. v Major League Baseball Players Assn., 208 F3d 885 ...................................... 27

Cardtoons, L.C. v Major League Baseball Players Assn., 335 F3d 1161 ................................... 32

National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143 .... 33

# I. INTRODUCTION

1. This case was filed by the Plaintiff because the Defendants PayCargo LLC ("PayCargo"), Eduardo Del Riego ("EDR"), and Jason Weber conspired collectively to coerce and threaten Plaintiff from communicating to and doing business with CargoSprint LLC ("CargoSprint") in 2020-2021 more than 22 months after Plaintiff no longer worked with PayCargo.

2. Defendants' argument that Plaintiff was served a threat letter and draft complaint to protect trade secrets is not true. Defendants put up a façade of suspense before the public and the court to achieve their practical objectives of preventing Plaintiff's business relationship with CargoSprint. Fla. Action is based wholly on Defendant's fabricated "facts", all of its "claims" have been voluntarily dismissed by Defendants and are not in dispute in this action.

3. Plaintiff had every right to establish a new business relationship with PayCargo's direct competitor after the expiration of its non-compete stipulation as part of Consulting Agreement (D.E. 1 Exhibit A). Defendants' desire to keep Plaintiff from pursuing its economic prosperity combined with the desire to hurt its direct competitor in the process is the true reason malice pleaded in instant and amended complaints took place.

4. Defendants fail to acknowledge or address the fact that the draft complaint served on Plaintiff contained false allegations against Plaintiff's wife. Allegations that she is a "computer programmer" and that she "aided and abetted" the theft of intellectual property. Those allegations never made it to the court docket in Florida due to their utter falsity and the Defendants' knowledge of them being false. Using lies to try and achieve Defendants' goals of intimidation, coercion, or plausible explanation. This is just an instance in the repeated pattern that Defendants have demonstrated before, during, and after Fla. Action took place

## II. FACTUAL BACKGROUND

### II.A. A PATTERN OF REPEATED, INTENTIONAL LIES

5. Plaintiff was never terminated by Defendant PayCargo, instead, Plaintiff resigned. The next day, Plaintiff received a meticulously prepared email from Defendant Eduardo del Riego ("EDR") stating that EDR instructed Plaintiff to "to cease and desist any changes to our system" and "terminate your involvement with PayCargo" over the phone the day before (Exhibit_3 Transition). That intentionally fabricated after-the-fact phone communication never took place (Exhibit_ 4 Termination).

6. Defendant's PayCargo's and EDR's tactic of fabricating the false event of termination and a "cease and desist" over a phone can be explained by Defendant EDR's desire to sue Plaintiff later by accusing Plaintiff of accessing PayCargo's systems after being fired as it would have provided a plausible explanation to the PayCargo Board on why its CTO who was responsible for the collection of annual fees in the amount of roughly $2MM that year is no longer with the company.

7. In post-employment retaliation, Defendants attempted to coerce Plaintiff to sign a false

statement affirming their fabricated events (Exhibit 5 Demand Letter).

8. Defendants employ the tactic of leveraging fabricated events in their Complaints in Fla.
   Action (Fla. Action D.E. 1, ¶21-23; D.E. 45, ¶22-24; D.E. 111, p. 8, ¶29-31)

9. In a letter written by PayCargo's New York employee, Thomas Vieweg to Plaintiff's wife,
   on the date of Plaintiff's resignation, Aug 15, 2018, Vieweg affirms Defendants' intent to sue
   Plaintiff. (Exhibit 6 Pay cargo disaster):

   *...I tried to explain these guys are going to file charges and a lawsuit against him. This will
   not be good for you and your family...I hate for this situation to cross the point of no return...*

10. Furthermore, Defendant PayCargo demonstrates a **pattern of baseless, repetitive claims**
    regarding Google Tag Manager allegedly being used as a spying tool by Plaintiff without any
    proof or "upon information and belief" clause that is not pertinent to the "trade secret" claims
    they are dismissing in the same document (Fla. Action D.E. 163 Vol. Dismissal p. 1 dated
    **Nov 9, 2021**):

    *He secretly left behind a Google Analytics tag linked to his personal account which allowed
    him access to PayCargo user data, a tag which was not discovered by PayCargo until after
    the litigation began.*

11. After making repeated allegations that Plaintiff spied on PayCargo's customers Defendant
    PayCargo pleads in its latest statement regarding the Google Tag that it didn't know what
    Plaintiff did with the tag (Fla. Action D.E. 187 Response to Rule 11 Sanctions p.12, dated
    **Jan 4, 2022**):

    *PayCargo would not know what Galbreath did, or did not do, with the tag, and thus sought to
    determine that through a third-party subpoena to Google. However, Google's response was*

*objections based primarily on the technical difficulty of the task. (April 15, 2021 Letter)*

*(attached as **Exhibit H**). PayCargo made the decision to focus on the Special Master*

*procedure to narrowly tailor its trade secret discovery, rather than pursue this matter further.*

12. In Aug 2021 discovery hearing, 3 months after receiving a response from Google and deciding to "*focus on Special Master procedure*", Defendant PayCargo continues making misrepresentations to the Florida district court (Fla. Action D.E. 142 p. 9, emphasis added):

*Mr. Galbreath, we also have put in our lawsuit and we have notified in the discovery, your Honor, planted a Google analytics tag in our system, unknown to us, which we discovered after he left, after he was in the employment of our competitor, CargoSprint, and that Google analytics tag allows Mr. Galbreath to continue to mirror -- I'm sorry, monitor our systems. **So that is what is in play, your Honor**. We don't know if Mr. Galbreath has left other tags, etc*

13. During the depositions in Fla. Action PayCargo corporate officer, Juan Dieppa commits perjury by intentionally lying about when and how he discovered the existence of the Google analytics tag to avoid further scrutiny (Fla. Action D.E. 186, p. 11-12 ¶53-54; D.E. 185 Exhibit 1 p. 29[p. 204 ]; D.E. 185 Exhibit 1 p. 49-50)

14. Continuing making claims that Plaintiff spied on Defendants' customers after abandoning all efforts to prove it and without any knowledge of what happened is a showing of Defendants' usage of intentionally false statements to inflict harm on Plaintiff.

15. Defendants made intentionally false statements about Plaintiff's wife (Exhibit 7 Draft Lawsuit ¶13,14,61,62,63,64):

16. Memorandum Introduction (D.E. 22) states "*PayCargo learned that Plaintiff planned to share PayCargo's protected trade secrets with one of its direct competitors*". The pleading is materially different from PayCargo's latest pleadings in Florida Action. (Fla. Action D.E.

9

187 Response to Rule 11 Sanctions p. 8).

17. There is no indication that Plaintiff *planned* to share any of PayCargo's information with a direct competitor in PayCargo's Rule 11 Response, instead, PayCargo cites "*reasonable fear*" as a trigger for their malicious conduct.

18. Although the line between permissible inference and impermissible speculation is not easy to discern, the Defendants' lack of common sense in their conduct is an alarming indication that they could not care less about their alleged "trade secrets".

19. When serving pre-suit correspondence on Plaintiff in Connecticut, Defendants weren't trying to prevent the alleged theft and there was no "fear" or likelihood for theft. The theft couldn't have happened after Plaintiff departed from PayCargo since Plaintiff didn't have access to the PayCargo system for 22 months.

20. If Defendants were suspicious that "sharing" of their IP was about to occur, that would require Plaintiff to have already stolen Defendants' "trade secrets". In that case, it would make sense to send a letter that would communicate: "You stole from us, return and/or destroy our IP or we'll sue you!".

21. Instead, Defendants sent correspondence that read something like "You and your wife stole from us, and we're going to file a federal lawsuit unless you stop talking to Joshua and tell us what you told him".

22. The letters specifically demand that Plaintiff stops communicating with Joshua/CargoSprint instead of demanding to return all "misappropriated" intellectual property back to its owner.

23. Defendants proceeded with suing Plaintiff alone, without adding CargoSprint as a Defendant to the lawsuit for another 8 months (Fla. Action D.E. 1, D.E. 45).

24. If Defendants were truly convinced that Plaintiff stole trade secrets from them and then

10

shared them with their main competitor, they would sue both their competitor CargoSprint and Plaintiff to stop "Misappropriation".

25. The Defendants' communications and actions were not guided by common sense for preventing theft or sharing of their intellectual property. Instead, they were guided by a desire to prevent or stop a business relationship.

26. The suspense of a crime that was about to happen was a wholly made-up nonsense tale. There was no reason for somebody to physically travel to Mexico to "share" "trade secrets".

27. Defendants understood that Plaintiff has never been sued in federal court and would struggle to find appropriate representation for a lawsuit in Florida with the limited resources and connections it had. That ill-perceived weakness on Plaintiff's side was used by Defendants to seek a "statement" from Plaintiff before involving properly represented CargoSprint.

28. Defendant Jason Weber appeared on the Florida Action as attorney of record on Feb 3, 2021 (Fla. Action D.E. 27) and on Feb 4, 2021, after a deposition Defendant Weber asked self-represented Plaintiff to provide a false statement that would self-incriminate Plaintiff and CargoSprint before CargoSprint was joined as Defendant in Fla. Action (D.E. 1 ¶22-23, Compl2 ¶31-32).

29. Settlement communications between Plaintiff and Jason Weber mentioned in ¶22, 23 of the complaint (¶31, 32 of Compl2) weren't *confidential*. There was no protective order in place when the communication took place on Feb 4, 2021, and neither of the parties to the call designated those communications confidential. They didn't take place in the course of a mediation or judicial proceeding. They were published on the public docket in the Fla. Action by Plaintiff and survived Defendant PayCargo's attempt to strike them (Fla. Action D.E. 96).

Case No: 22-CV-02907-HG-JRC

30. Defendants have demonstrated atrocious conduct of fabricating a chain of false events, initiating a sham action, and then coercing Plaintiff to sign a false self-incriminating statement using their superior economic position and knowledge of civil procedure and "trade secret" claims (*Coihue LLC vs. PayAnyBiz, LLC* (1:17-cv-24062))

## II.B. OTHER FACTS

31. The consulting agreement (D.E. 1, Exhibit A) wasn't terminated in 2017. It was terminated in 2018 when Defendant PayCargo stopped paying their invoices. A copy of the last paid invoice dated Aug 2018 is attached in (Exhibit 8 LastPaidInvoice).

32. Plaintiff's Bank Account that Defendant PayCargo remitted payments to for Wale Up LLC invoices and Plaintiff's Payroll is in New York (Exhibit 9 Bank Statement)

33. Fla. Action for Rule 11 Sanctions requested disciplinary action against attorneys Jason Weber and Wayne Atkins. PayCargo wasn't included in the requested relief and no monetary relief was requested. (D.E. 23, Exhibit 5, p. 8-9).

34. Fla. Action falsehoods were rephrased and republished by the list of publications in the US and UK, including, but not limited to:

    a. https://www.freightwaves.com/news/freighttech-firm-paycargo-awarded-116m-in-cargosprint-trademark-case (Cached copy: Exhibit 10 FreightWaves):

*PayCargo alleges its former chief technology officer gave CargoSprint some of PayCargo's code*

    b. https://theloadstar.com/paycargo-wins-latest-legal-battle-with-cargosprint-over-name-change-confusion/ (offending statements were removed after Plaintiff notified publication of instant action. Original: Exhibit 11 Loadstar):

*One, rather juicy case, remains outstanding. It involves Pavel Galbreath, was PayCargo's*

*CTO for a year. He left in 2018, but according to PayCargo retained access credentials to its*

*platform and continued to access data. In 2020, he went to Mexico to meet CargoSprint,*

*where, it was claimed, he shared trade secrets.*

    c. https://aircargoworld.com/news/technology/paycargo-moves-for-dismissal-in-one-cargosprint-case/ , Exhibit 12 Weber Publication:

*in the Southern District of Florida, PayCargo was "unable to obtain viable confirmation one*

*way or the other" during the discovery period as to whether files the company alleged*

*contained the trade secrets actually did contain them, according to the motion*

35. These statements derived from Fla. Action court papers and commentary by Defendant Weber continue to be published without regard to the Special Master report (Fla. Action D.E. 134, Exhibit 1) that found proof contrary to those statements.

## II.C. LONG-ARM STATUTE AND MINIMUM CONTACTS

36. Defendants have minimum contacts in New York to satisfy New York Long-Arm Statute (Exhibit 13 Wolf_Declaration).

37. Exhibit 14 Blackstone depicts a publication on the PayCargo.com website. The publication quotes Defendant EDR stating the following:

*Blackstone's experience in the logistics, supply chain, and e-commerce space, will be invaluable for PayCargo as we continue to expand globally*

38. BlackStone Inc. is an international financial company headquartered in New York.

39. Exhibit 15 Insight Partners (*rectangles added*) depicts a publication on InsightPartners.com where Defendant EDR states the following:

13

*We are excited to accelerate our mission to bring modern payment solutions to our increasingly global base of customers.*

40. The investment and the publication were made by Insight Venture Management, LLC, headquartered in New York.

41. Defendant PayCargo entered into a partnership agreement with Gemini Shippers Group headquartered in New York (Exhibit 16 Gemini). EDR is quoted saying the following about this agreement:

*This agreement provides an added value to the group's members who will now have a built-in solution to complete payment processes.  By combining Gemini's electronic invoice and audit functions with our payment solution we will together streamline and bring substantial savings in accounts payable and overhead*

42. PayCargo website lists a variety of their vendor customers in New York:

    a. https://paycargo.com/vendors/asiana-express-new-york/

    b. https://paycargo.com/vendors/new-york-customs-brokers/

    c. https://paycargo.com/vendors/virgin-atlantic-jfk/

    d. https://paycargo.com/vendors/jfk-same-day-release-in-paycargo/

    e. https://paycargo.com/vendors/gct-global-container-terminals/

    f. https://paycargo.com/vendors/jenson-logistics-inc-ny-new-paycargo-vendor/

    g. https://wp.paycargo.com/vendors/ports-america/

43. Defendant PayCargo provides a service of electronic money transfer between its payer and vendor clients. Payer clients make the payment while vendor clients receive the payment through PayCargo. Both provide their bank account information to the PayCargo system (Fla. Action D.E. 111 p. 3). The payment information for both payers and vendors is transferred to the chartered bank, that performs the actual settlement of funds.

14

Case No: 22-CV-02907-HG-JRC

44. Each Vendor ("Biller") and Payer client have to enter into an agreement with PayCargo LLC before being able to receive or send payments (Exhibit 17 PayCargoTC p. 13).

45. PayCargo remits payments to four hundred fifty-two (452) vendor clients located in New York (Exhibit_18 PayCargoVendorList, List retrieved from PayCargo.com in Sept. 2022)

46. After making the payment PayCargo payer clients normally pick up their cargo in one of New York cargo handling facilities (vendor clients). New York cargo handling facilities release cargo based on the information supplied by PayCargo that payment was completed.

47. PayCargo entered into an agreement with software development company Wale Up LLC incorporated in New York and agreed to New York laws governing it. (D.E. 1 Exhibit A).

48. The business relationship between Defendant PayCargo and Plaintiff arose out of the introduction made by Defendant PayCargo's business contact in New York, Thomas Vieweg in 2017 (Exhibit 19 Introduction)

49. When joining Wale Up LLC as Defendant in Florida Action PayCargo, EDR and Jason Weber had an expectation that they may be held responsible for their actions in New York as they alleged that Wale Up LLC is a New York corporation with a primary place of business in New York (Fla. Action D.E. 45 Amended Complaint; D.E. 111 2nd Amended Complaint)

50. In their Complaint, Defendant PayCargo alleges that Wale Up LLC is wholly owned by Plaintiff and acts as an alter-ego of Plaintiff (Fla. Action D.E. 111 2nd Amended Complaint p. 5), alleging that there is no legal difference between Wale Up LLC and Plaintiff.

51. PayCargo maintains an online directory of personnel on LinkedIn. Each employee self-reports their location and title at PayCargo (Exhibit 20 Directory). According to this listing, there are 10 PayCargo officers that are in the Greater New York City area.

Case No: 22-CV-02907-HG-JRC

## II.D. VENUE CONVENIENCE

52. New York is a common venue for parties that do business internationally. New York has a variety of qualified experts to address the issues of fraud and fabrication.

53. Given that majority of depositions and discovery nowadays are done via electronic means, Discovery in New York should not put the burdens of travel on the Florida-domiciled Defendants or their attorneys.

## II.E. KEY WITNESSES

54. The Defendants naming of key witnesses to this case is irrelevant and inappropriate for their Memorandum and can't be used as factual background for their arguments in favor of dismissing this case.

## II.F. SPECIAL DAMAGES

55. Plaintiff has suffered a loss of clients (Exhibit 21 Pieretti Declaration) that resulted in opportunity costs of $80,000.

56. Plaintiff incurred attorneys' fees and court costs in the amount of $60,000 (ongoing).

57. Plaintiff has suffered opportunity costs (Exhibit 13 Wolf Declaration) of becoming a 5% shareholder of CargoSprint.

58. CargoSprint valuation is in the neighborhood of $200MM as of Oct 2022. Being a 5% shareholder would have resulted in capital gains of around $10,000,000.00 in the absence of Defendants' interference in the business relationship between Plaintiff and CargoSprint.

59. In addition, Plaintiff now has to track every republication of the falsehoods alleged in the Fla. Action and contact publishers to make them aware of this action. This incurs further opportunity costs.

## III. LEGAL ARGUMENT

### III.A. LONG-ARM STATUTE

60. The Plaintiff's Amended Complaint ("Conpl2") alleges that Defendants have minimum contracts in New York and that they had reasonable expectations that their actions could give rise to claims in New York.

61. This Court has personal jurisdiction over Defendant PayCargo and its administrator, EDR and its executor Jason Weber pursuant to CPLR 302(a)(3)(I), and CPLR 302(a)(3)(II) as PayCargo (a) derives significant amount of revenue in interstate and international commerce (b) committed a torturous act without the state causing injury to a person within the state (c) regularly does business in the state (d) derives substantial revenue from payments services rendered, in the state (e) reasonably expected the act to have consequences in the state. See *Williams v Beemiller, Inc.*, 33 N.Y.3d 523; *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210

62. In *Penguin Group (USA) Inc. v. American Buddha*, 16 N.Y.3d 295:

*Consequently, a plaintiff relying on this statute must show that (1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce (see LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 214, 735 NE2d 883, 713 NYS2d 304 [2000])*

63. In *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210:

*The fourth element--contemplating "in-State consequences"--is met when "[t]he nonresident tortfeasor ... expect[s], or ha[s] reason to expect, that his or her tortious activity in another*

*State will have **direct** consequences in New York" (Ingraham v Carroll, 90 NY2d 592,*

*598 [emphasis added])*

64. In *Penguin Group (USA) Inc. v. American Buddha*, 16 N.Y.3d 295 Appellate court held that copyright infringement that took place outside of New York satisfied the long-arm statute as it caused damages in New York.

65. In *Chloe v Queen Bee of Beverly Hills, LLC*, 616 F3d 158, 161 [2d Cir 2010]:

*N.Y. C.P.L.R. § 302(a) confers jurisdiction over individual corporate officers who supervise and control an infringing activity.*

66. In *Nick v Schneider*, 150 AD3d 1250, 1251 [2d Dept 2017]:

*However, to successfully oppose such a motion, the plaintiff need only make a prima facie showing that the defendant was subject to the personal jurisdiction of the court" (id. at 51; see Chen v Guo Liang Lu, 144 AD3d 735, 736, 41 NYS3d 517 [2016]). The facts alleged in the complaint and affidavits in opposition to such a motion to dismiss are deemed true and construed in the light most favorable to the plaintiff, and all doubts are to be resolved in favor of the plaintiff (see Weitz v Weitz, 85 AD3d 1153, 1153-1154, 926 NYS2d 305 [2011])*

### III.B. CONSTITUTIONALITY OF LONG-ARM STATUE

67. In *Overstock.com, Inc. v New York State Dept. of Taxation & Fin.*, 20 N.Y.3d 586:

*Moreover, courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional" (LaValle v Hayden, 98 NY2d 155, 161, 773 NE2d 490, 746 NYS2d 125 [2002] [citations omitted])*

68. In *Williams v Beemiller, Inc.*, 33 N.Y.3d 523:

Case No: 22-CV-02907-HG-JRC

*As a majority of this Court concludes today (the Judges who concur with the majority and us), CPLR 302 was "designed to be 'well within constitutional bounds' (12th Ann Rep of NY Jud Conf at 341 [emphasis added]), and subparagraphs (i) and (ii) of CPLR 302 (a) (3) 'were deliberately inserted' to achieve that goal (Ingraham v Carroll, 90 NY2d 592, 596-597, 687 NE2d 1293, 665 NYS2d 10 [1997])" (concurring op at 534). A fortiori, if a non-domiciliary's actions satisfy CPLR 302 (a) (3) requirements, then the same conduct satisfies the federal minimum contacts test.*

### III.C. INSTANT ACTION CLAIMS ARE NOT COMPULSORY COUNTERCLAIMS

69. This action arises from a different set of facts than Florida Action. Florida action arises out of Plaintiff's working relationship with Defendant PayCargo in 2017-2018 and Plaintiff's communications with CargoSprint LLC in 2020. This action arises out of a different transaction of occurrence that took place after Plaintiff departed from PayCargo: Defendants' fabrication of events around Plaintiff's departure, threats, and coercion attempts, knowingly and intentionally false statements made in the sham lawsuit in Florida, subsequent re-publications of false statements and the resulting damages in New York (Compl2 ¶39,42-44):



70. In *Federman v Empire Fire & Mar. Ins. Co.*, 597 F2d 798, 811-812 [2d Cir 1979]:

Case No: 22-CV-02907-HG-JRC

*The factors most generally considered by these tests as indicators of the compulsory nature of a claim are: (1) identity of facts between original claim and counterclaim; (2) mutuality of proof; (3) logical relationship between original claim and counterclaim. Although these factors or tests may be indicative in one sense or another of the compulsory character of a counterclaim, no one of them is conclusive, and should not be relied on exclusively.*

71. There is no *identity of facts* or *mutuality of proof* between claims in the Fla. Action and claims in this action. Only a *logical relationship*.

72. In *Aetna Cas. & Sur. Co. v Spartan Mech. Corp.*, 738 F Supp 664, 669 [EDNY 1990]:

*While, at a minimum, it has at least been required that a claim be "logically related" to the main action to come within the court's ancillary jurisdiction, Wright, supra § 3523 at 96; cf. Federman v. Empire Fire & Marine Ins. Co., 597 F.2d 798, 812 n. 21 (2d Cir. 1979) (criticizing "logical relation" test as "overbroad" and resulting in "uncertainty in application"), the boundaries of ancillary jurisdiction have stretched far and wide*

73. In *Harris v Steinem*, 571 F2d 119 [2d Cir 1978] On appeal, the court affirmed. Appellants' counterclaim was not compulsory under Fed. R. Civ. P. 13(a) because it was based not on the stock sale as the appellee's action was, but rather on the filing of the appellee's complaint and subsequent publicity.

74. In *KGK Jewelry LLC v ESDNetwork*, 2014 US Dist LEXIS 177137, at *11 [SDNY Dec. 24, 2014, No. 11CV9236-LTS-RLE]:

*As previously explained, the Yeko **Parties'** Action II claims do not "arise[] out of the transaction or occurrence that is the subject matter" of the Opposing **Parties'** claims; Action I focuses on a discrete pair of contracts between a limited group of **parties**, while Action II*

20

*contains a sweeping set of claims asserted against a broad array of defendants. Inconsistent*

*adjudications arising from the two separate actions are therefore not a concern.*

75. In *Banque Indosuez v Trifinery*, 817 F Supp 386, 387-388 [SDNY 1993] district court ruled that the counterclaim is not compulsory:

*Plaintiff's claim is for payment on a promissory note. Defendants' counterclaims allege, in*

*substance, that plaintiff negligently delayed the processing and delivery of letters of credit. It*

*is clear that the issues raised are not sufficiently interrelated to render defendants'*

*counterclaim compulsory.*

76. Defendants quote *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) where counterclaim was considered compulsory by the Second Circuit. However, in that case the transaction of occurrence were the guarantees to the merger agreement and the merger agreement, both of which were executed at the same time:

*The plaintiffs, for their part, assert that the guarantees and the merger constitute separate*

*transactions, which different courts properly may untangle. We disagree. The guarantees and*

*the merger agreement were executed together and, by plaintiffs' own argument, the parties*

*would not have signed one without the other. If actionable fraud occurred, it clearly induced*

*and was related to the guarantees. Moreover, under Second Circuit case law, claims for*

*rescission and enforcement arise out of the same transaction or occurrence.*

77. Claims in Florida Action arise out of prior contractual relationship between Plaintiff and Defendant PayCargo. Claims of this action do not arise out of that relationship, claims of this action are not a rescission or enforcement attempt of the prior agreements between Plaintiff and Defendant PayCargo.

78. In *Natl. Equip. Rental, Ltd. v Fowler*, 287 F2d 43, 45 [2d Cir 1961] Second Circuit ruled that one of the counterclaims was considered compulsory because they originated from the same transaction of lease:

*Of the two causes of action which appellants allege in their Alabama action, the first is identical to appellants' defensive counterclaim in the prior, the New York, action; the second, fraud in the inducement of the agreement, arises from the same transaction of lease, and is pleadable in the New York action as a compulsory counterclaim.*

79. Defendants mention *Critical-Vac Filtration Corp. v Minuteman Intl. Inc.*, 233 F3d 697 [2d Cir 2000] in which counterclaims were considered compulsory because they originated from the same transaction of occurrence: Minuteman's Patent Application:

*In the instant case, C-Vac alleges that **Minuteman** intentionally deceived the Patent Office and knowingly tried to enforce an invalid patent by pursuing sham litigation against C-Vac and other alleged infringers. Specifically, C-Vac alleges that **Minuteman** "secured by fraud [] a patent for the purpose of preventing C-Vac from competing with **Minuteman** in the sale of [HEPA filters]"; attempted "to enforce a patent it knew to be invalid"; and used "patent litigation against C-Vac and others to enforce a patent which, even if valid, **Minuteman** knew was not being infringed and was not enforceable," thereby attempting "to extend the patent beyond its lawful scope."*

80. Moreover, the validity of Minuteman's re-issue patent was already addressed in prior litigation. None of the issues brought up in this suit were addressed in Florida Action. The Rule 11 Motion for Sanctions was denied due to procedural deficiencies without addressing its merits (Fla. Action D.E. 196). Moreover, Rule 11 Motion in Florida Action requested

disciplinary relief against individual attorneys, no monetary relief was requested, and

Defendant PayCargo and EDR were not part of the requested relief.

81. In *Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills*, 701 F Supp 2d 568, 590 [SDNY 2010]:

*Moreover, the Court noted that Critical-Vac did not "allege[] [in the second action] any facts*

*that arose after the filing of its answer in the [prior patent infringement] litigation."*

82.  In instant action, Plaintiff alleges facts that took place after filing of its answer to 2nd

Amended Complaint in Florida Action. Defendant PayCargo voluntarily dismissed Florida

Action in Nov 2021 (D.E. 1 ¶29; Compl2 ¶41), Defendant Jason Weber made a public

statement about the Fla. Action (D.E. 1 ¶30; Compl2 ¶42), Fla. Action claims were re-

published in newspapers (Compl2 ¶43).

83. It wasn't apparent to everyone that Fla. Action is a sham lawsuit until Defendant PayCargo

failed to provide any evidence in support of their claims at the closing of the discovery in

November 2021.

84. It wasn't clear to everyone why Defendant PayCargo filed Florida Action up until PayCargo

filed their Response to Rule 11 Motion for Sanctions (Fla. Action D.E. 187) where they

failed to provide any basis for probable cause or evidence of damages before or after the

filing of the Florida Action.

85. In *KGK Jewelry LLC v ESDNetwork*, 2014 US Dist LEXIS 177137, at *11 [SDNY Dec. 24,

2014, No. 11CV9236-LTS-RLE]:

*As previously explained, the Yeko **Parties'** Action II claims do not "arise[] out of the*

*transaction or occurrence that is the subject matter" of the Opposing **Parties'** claims; Action I*

*focuses on a discrete pair of contracts between a limited group of **parties**, while Action II*

*contains a sweeping set of claims asserted against a broad array of defendants. Inconsistent*

*adjudications arising from the two separate actions are therefore not a concern.*

### III.D. FLORIDA LITIGATION PRIVILEGE

86. Defendants argue that claims in instant action must be dismissed because they are barred by Florida's litigation privilege, this suit doesn't bring up claims of defamation but instead it brings up claims of fraud and injurious falsehood with complete disregard for the truth. Fraudulent statements are not protected by the litigation privilege.

87. In *Conti v Doe*, 535 F Supp 3d 257, 281 [SDNY 2021]:

*Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2, 419 F. Supp. 3d 668, 692 (S.D.N.Y.*

*2019) (holding that the litigation privilege did not protect defendant, which had allegedly*

*orchestrated a fraud scheme to obtain default judgments for unprovable debts, from being*

*sued under the Fair Debt Collection Practices Act, the N.Y. General Business Law, or the*

*N.Y. Judiciary Law); Full Circle United, LLC v. Skee-Ball, Inc., No. 11-CV-5476, 2014 U.S.*

*Dist. LEXIS 202841, 2014 WL 12829195, at \*7 (E.D.N.Y. May 13, 2014) (holding*

*that litigation privilege did not apply to preclude a claim for breach of contract); Sykes v. Mel*

*Harris & Assocs., LLC, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010) ("Because plaintiffs have*

*not claimed defamation, the [litigation] privilege is wholly inapplicable").*

88. In *Passaro-Henry v Allstate Ins. Co.*, 2010 US Dist LEXIS 132478 [D Conn Dec. 15, 2010, No. 3:10-cv-450 (JCH)]:

*but by filing a pattern of frivolous lawsuits in order to dissuade healthcare professionals from*

*submitting claims. There is no basis for extending the privilege for statements made in the*

*course of a judicial proceeding to such conduct.*

Case No: 22-CV-02907-HG-JRC

89. In *Flomenhaft v Finkelstein*, 127 AD3d 634, 638 [1st Dept 2015]

*This Court has recognized, however, that the privilege is capable of abuse and will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant (see Lacher v Engel, 33 AD3d 10, 13-14, 817 NYS2d 37 [1st Dept 2006]). Lacher derived this principle from Halperin v Salvan (117 AD2d at 544), in which this Court declined to dismiss a defamation claim based on the pertinency privilege where the context in which the allegedly offending statement was made was a litigation that the plaintiffs filed but never prosecuted*

90. In *Lewis v Pierce Bainbridge Beck Price Hecht LLP*, 2020 NY Slip Op 31594[U], *6 [Sup Ct, NY County 2020]:

*This qualified privilege applies "to statements pertinent to a good faith anticipated litigation. This requirement ensures that privilege does not protect attorneys who are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims, unsupported in law and fact, in violation of counsel's ethical obligations." (Front, Inc., 24 NY3d at 720.) Here, plaintiff focuses on Conley's involvement in slowing plaintiff in his race to the court with PB. Plaintiff's objection to the LA Action does not make it baseless or a sham. (See e.g. Flomenhaft v Finkelstein, 127 AD3d 634, 638, 8 N.Y.S.3d 161 [1st Dept 2015] [privilege did not apply because in separate litigation against former attorney, client admitted that he was induced by defendant's false statements to sue plaintiff]; see also Halperin v Salvan, 117 A.D.2d 544, 548, 499 N.Y.S.2d 55 [1st Dept 1986] [absolute privilege did not apply because court found sham litigation was evidenced by failure to move forward in action].)*

25

91. In *Giuffre v Maxwell*, 2017 US Dist LEXIS 64405, at *23 [SDNY Mar. 27, 2017]:

*In addition, as this Court concluded in denying Maxwell's motion to dismiss, "[t]here is no qualified privilege under New York law when such statements are spoken with malice, knowledge of their falsity, or reckless disregard for their truth."* Giuffre*, 165 F. Supp. 3d at 155 (internal quotation marks and citation omitted).*

92. In *Sexter & Warmflash, P.C. v Margrabe*, 38 AD3d 163, 173 [1st Dept 2007]:

*To be actionable, a statement made in the course of judicial proceedings "must be so outrageously out of context as to permit one to conclude, from the mere fact that the statement was uttered, that it was motivated by no other desire than to defame" (id.; see also Cavallaro v Pozzi, 28 AD3d 1075, 1077, 814 NYS2d 462 [2006]; Grasso, 164 AD2d at 479).*

93. Defendants made fraudulent statements in Fla. Action regarding Google Analytics Tag that were not pertinent to their "trade secret" claims and were spoken with pure malice toward Plaintiff.

III.E. NOERR-PENNINGTON DOCTRINE

94. The instant and amended complaint plead that Defendant PayCargo interfered in a business relationship between Plaintiff and its main Competitor CargoSprint with a sham lawsuit (D.E. 1 ¶26, 27, Compl2 ¶25, 26, 34, 38).

95. In *Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills*, 701 F Supp 2d 568, 573 [SDNY 2010]

*Noerr-Pennington immunity extends only to activities (including litigation) that are not a mere sham to cover an attempt to interfere directly with the business relationships of a competitor.*

96. In *Cardtoons, L.C. v Major League Baseball Players Assn.*, 208 F3d 885, 886 [10th Cir 2000]:

*This case requires us to determine whether threats of litigation between purely private parties in a non-antitrust setting are immunized from liability under the **Noerr-Pennington** doctrine or under the right to petition clause of the First Amendment. Because purely private threats do not constitute a petition to the government, we hold that they are not constitutionally protected*

97. In *DirecTV, Inc. v. Lewis*, 2005 U.S. Dist. LEXIS 8187 mentioned by the defendants the company threatening legal action had evidence that could be considered circumstantial in their possession before pre-suit correspondence.

*Specifically, DirecTV had documentary proof that Militello had purchased an Unlooper, a device which DirecTV alleges is capable of altering DirecTV access cards so those cards can receive DirecTV signals illegally.*

98. DirecTV lawyers had acted quickly and aggressively but within the bounds of common sense to prevent theft.

99. In this case Defendants had a lodging confirmation for Plaintiff's stay in Guadalajara, Mexico 22 months after he left the company. They somehow thought it was necessary for Plaintiff to travel to Mexico "in the middle of the global pandemic" to share trade secrets that were allegedly stolen by him and his wife 22 months ago. This suspense fabrication doesn't hold water, it's a façade to hide real objectives of Defendants.

100.    Unlike the DirecTV case, Defendants have jumped to conclusions that most satisfied their goals and not the common sense.

### III.F. FED. R. EVID. 408. COMPROMISE OFFERS AND NEGOTIATIONS

101.    Federal Rule of Evidence 408 prohibits use of attempt to compromise a claim as evidence of weak position or in attempt to disprove the claim.

102.    The instant and amended complaints (D.E. 1 ¶28-29, Compl2 ¶20, ¶31-32) plead an economic threatening tactic employed by the Defendants to obtain a sworn statement from the Plaintiff. The pleading doesn't attempt to prove or disprove claims in Florida Action to which the settlement communication relates.

103.    The claims in Florida Action are no longer relevant as they were voluntarily dismissed by Defendant PayCargo and they are not at dispute in this case.

104.    Furthermore, the communications in question are now part of the public domain that survived a striking attempt in Florida Action (Fla. Action D.E. 96) and are material to the claims of this action.

105.    In *Steak Umm Co., LLC v Steak 'Em Up, Inc.*, 2009 US Dist LEXIS 101357, at *1 [ED Pa Oct. 29, 2009, No. 09-2857]:

*The court held that Fed. R. Evid. 408 did not govern pleadings. The reference to settlement was not so irrelevant as to require striking of any part of the complaint.*

106.    This court has concluded similarly in *Sadigh v Educ. Credit Mgt. Corp.*, 2022 US Dist LEXIS 142791, at *10 [EDNY Aug. 10, 2022, No. 22-CV-00298 (HG) (JRC)]:

*However, Rule 408 prohibits evidence of settlement discussions only if a party seeks to admit that evidence "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a); Westwide Winery, Inc. v. SMT Acquisitions, LLC, 511 F. Supp. 3d 256, 265 (E.D.N.Y. 2021). A court "may*

28

*admit" the same evidence "for another purpose." Fed. R. Evid. 408(b); see Clerveaux v. E.*

*Ramapo Cent. Sch. Dist., 984 F.3d 213, 243 (2d Cir. 2021). Accordingly, a court may decline*

*to strike from a complaint allegations related to purported settlement discussions, especially*

*at an "early stage in the proceedings," at which point "the Court cannot conclude that no*

*evidence in support of this allegation would be admissible for some other purpose." Shouq v.*

*Norbert E. Mitchell Co., Inc., No. 18-cv-293, 2018 U.S. Dist. LEXIS 148001, 2018 WL*

*4158382, at \*5 (D. Conn. Aug. 30, 2018) (denying motion to strike)*

### III.G. TWOMBLY PLEADING STANDARD

107.    The Amended Complaint ("Compl2") pleads unlawful actions by Defendants that include

threats and coercion along with intentional falsehoods that caused harm to Plaintiff.

108.    The instant and amended complaint plead factual background (D.E. 1, ¶12-30, Compl2

¶15-44) with the specificity of what actions did defendants take and when to cause damages

that give rise to this suit. Coercion via pre-suit correspondence, wrongful means of Fla.

Action, countless falsehoods, and purposefully fabricated statements to cause malice.

### III.H. MALICIOUS PROSECUTION IN CIVIL PROCEDURE

109.    Plaintiff pleads a new claim of Malicious Prosecution as Count I in Compl2 factual

background satisfies all the elements of the claim

*To state a claim under New York law for the malicious prosecution of a civil action, a plaintiff*

*must show*

*(1) the initiation of an action by the defendant against him,*

*(2) begun with malice,*

*(3) without probable cause to believe it can succeed,*

*(4) that ends in failure or, in other words, terminates in favor of the plaintiff and*

*(5) causes special injury*

(*Engel v. CBS*, 145 F.3d 499, 502 (2d. Cir. 1998) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d. Cir. 1996))

### III.I. TORTIOUS INTERFERENCE

110.    Compl2 cures deficiencies pointed out by Defendants' attorneys and sufficiently pleads the claim of Tortuous Interference: (1) Defendants knew about Plaintiff's relationship with 3rd party CargoSprint (Compl2 ¶52) (2) Defendants intentionally interfered in this relationship (Compl2 ¶53-56) (3) Defendants acted by the use of wrongful means or the sole purpose of malice (Compl2 ¶53-57) (4) it resulted in injury to the business relationship (Compl2 ¶58-55)

111.    Proof of Defendants' knowledge of Plaintiff's existing business relationship with CargoSprint LLC is in court papers (Fla. Action D.E. 38, ¶2):

*Plaintiff has learned through a deposition in a related case that Defendant is actively performing work for this competitor. This warrants more detailed allegations in an Amended Complaint as well as the addition of the competitor and a company Defendant performs contract work through as parties to this case.*

112.    Compl2 pleads that malice was directed at 3rd party CargoSprint (Compl2 ¶52). CargoSprint was joined as Defendant in Florida Action in Feb 2021 (Fla. Action D.E. 45) and PayCargo dismissed their allegations against CargoSprint in Nov 2021 (Fla. Action D.E. 163). Defendants only intended to harass CargoSprint without the intention to bring Fla.

30

Action to a definitive adjudication.

113.   Compl2 pleads fraudulent misrepresentations with intent to harm made by Defendants in

Florida Action (Compl2 ¶26.c-e, 35) against Plaintiff.

114.   In *Arnon Ltd (IOM) v Beierwaltes*, 125 AD3d 453, 453-454 [1st Dept 2015]:

*'Wrongful means' include[s] physical violence, fraud or misrepresentation, civil suits and*

*criminal prosecutions, and some degrees of economic pressure" (Carvel, 3 NY3d at 191).*

*Where the interfering conduct is a civil suit, it must be shown that the suit was "frivolous"*

*(Pagliaccio v Holborn Corp., 289 AD2d 85, 85, 734 NYS2d 148 [1st Dept 2001])*

*115.*   In *Caldera Holdings LTD v Apollo Global Mgt., LLC*, 2019 NY Slip Op 33734[U], *8

[Sup Ct, NY County 2019]:

*Civil suits, even those sufficiently alleged to be frivolous, must be "directed not at the plaintiff*

*itself, but at the party with which the has or seeks to have a relationship.*

116.   In *Faiveley Transp. USA, Inc. v Wabtec Corp.*, 2011 US Dist LEXIS 52945, at *29

[SDNY May 12, 2011]:

*the Court noted that some indirect **business** relationships — even if not memorialized in a*

*contract — are sufficient for a plaintiff to recover for **tortious interference**. <u>Id. citing Brown*

*v. AXA RE.</u>, 2004 U.S. Dist. LEXIS 7624, 2004 WL 941959 (S.D.N.Y. May 3, 2004)*

117.   In *Lombardo v Seuss Enters., L.P.*, 2017 US Dist LEXIS 64854, at *16 [SDNY Apr. 7,

2017]

*A baseless threat of **litigation** may constitute wrongful means. However, "this is true only*

*when (1) the [defendant] has no belief in the merit of the **litigation**, or (2) the defendant*

*otherwise institutes or threatens to institute **litigation** in bad faith, intending only to harass the third parties and not to bring [its] claim to definitive adjudication." Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F. Supp. 3d 436, 451 (S.D.N.Y. 2014) (internal quotation marks and citations omitted).*

### III.J. INJURIOUS FALSEHOOD

118.    Plaintiff cures the deficiencies pointed out by the Defendants attorneys regarding the claim of Injurious Falsehood. Compl2 ¶65 specifies special damages (also ¶55-59 supra).

119.    The false statements were identified in the factual background of the instant complaint and Compl2 ¶61.

### III.K. PRIMA FACIE TORT

120.    Plaintiff cures the deficiencies pointed out by the Defendants attorneys in the Prima Facie Tort claim. Compl2 ¶67 specifies a single action caused solely with disinterested malevolence: Publishing a knowingly false statement on the Defendant's Motion to Voluntarily dismiss Florida Action without prejudice (¶10 supra).

121.    The action giving rise to a prima facie tort claim is not the filing of Fla. Action, but the statement made upon its dismissal by Defendants.

122.    Plaintiff specifies special damages in Compl2 ¶69 (also ¶55-59 supra).

123.    The offending statement was made in the course of voluntary dismissal without prejudice and therefore had no pertinence to Fla. Action claims. The statement was made with malice toward Plaintiff.

124.    In *Cardtoons, L.C. v Major League Baseball Players Assn.,* 335 F3d 1161, 1167 [10th Cir 2003]:

*to prevail at common law on a theory of prima facie tort, a plaintiff must show that the*

*defendant's conduct was "generally culpable and not justified under the circumstances."*

*National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143,*

*1151 (10th Cir. 2000) (citing Restatement (Second) of Torts § 870)).*

## IV. CONCLUSION

Defendants are subject to this court's jurisdiction. The damages for the four counts of the Plaintiff's Amended Complaint injured a Person and its' businesses in New York. Defendants have sufficient minimum contacts in this court's venue state. The Defendants' conduct was fraudulent and therefore would not be protected by the Litigation Privilege or Noerr-Pennington Doctrine. Claims of this action do not arise from the same transaction of occurrence as that of Fla. Action. The court should allow Plaintiff an opportunity to file an Amended Complaint and deny the Defendants' motions to dismiss or alternatively transfer this action.

Dated:  October 26, 2022

__/s/Pasha Probiv_____
Pasha Probiv (*pro se*)
1216 Broadway, 2nd Fl
New York, NY 10001
Phone: (203) 903-2748
Email: pasha.probiv@gmail.com

Case No: 22-CV-02907-HG-JRC