**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

PAYCARGO, LLC,

                                              CASE NO.:

        Plaintiff,

v.                                            JURY TRIAL DEMANDED

PAVEL GALBREATH a/k/a PASHA
GALBREATH a/k/a PASHA PROBIV;
LAURI GALBREATH; and
WHITEHACK, LLC,

        Defendants.

_____/

## COMPLAINT

Plaintiff PAYCARGO, LLC ("Plaintiff" or "PayCargo") hereby sues Defendants, PAVEL

GALBREATH a/k/a PASHA GALBREATH a/k/a PASHA PROBIV, LAURI GALBREATH, and

WHITEHACK, LLC, and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff PayCargo is a Delaware limited liability company authorized to transact

business within the State of Florida and with its principal place of business in Miami-Dade County,

Florida.

2.     Defendant Pavel Galbreath a/k/a Pasha Galbreath a/k/a Pasha Probiv ("Pasha") is

an individual who is at least 18 years of age, who resides in New York and is otherwise *sui juris*.

3.     Defendant Lauri Galbreath ("Lauri") is an individual who is at least 18 years of

age, who resides in New York and is otherwise *sui juris*.

4.     Pasha and Lauri are married.

1

**CONFIDENTIAL**                                    **PG 1034**

5.    Defendant WhiteHack, LLC ("WhiteHack") is a Delaware limited liability corporation with its principle place of business in Delaware.

6.    This Court has subject matter jurisdiction under the Court's federal question jurisdiction based on allegations that Defendants misappropriated trade secrets and violated the Lanham Act. This Court has supplemental jurisdiction over the state law claims alleged herein.

7.    Venue is proper in Miami-Dade County, Florida because this cause of action arose in Miami-Dade County, Florida.

### GENERAL ALLEGATIONS

8.    PayCargo provides an electronic payment platform designed to process payments in the freight and logistics industry. This system allows for payers to make payments for cargo shipments to a network of vendors and facilitates the prompt release of said cargo by the vendors.

9.    Pasha worked for PayCargo from in or about July, 2017 until on or about August 15, 2018. Pasha was employed as PayCargo's Chief Technology Officer ("CTO"), during which time Pasha enjoyed unlimited access to PayCargo confidential and propriety systems and technologies. Pasha directed the PayCargo technology team as well as architected a major redesign of the PayCargo platform.

10.   In connection with his employment, Pasha signed the Employment Agreement attached as **Exhibit A**.

11.   This Employment Agreement prohibits the disclosure of any of PayCargo's "Trade Secrets and Confidential Information." This includes, *inter alia*, the identity of any customers of PayCargo as well as technical information regarding the PayCargo platform.

12.   In connection with Pasha's role as PayCargo's CTO, he was involved in the following aspects of PayCargo's most sensitive information and had full access to, among other

2

things: customer lists, customer bank account information, customer transaction histories, system architecture, hosting accounts and configuration of same, money flow processes, the NACHA process (money movement instructions), the source code, code management tools, development management tools, internal communications tools, customer service management tools, customer facing website security programs, and the system's production servers (the "Trade Secrets").

13.     At the direction of his wife, Lauri, Pasha maintained copies of certain of the Trade Secrets on his personal computer, in addition to his authorized PayCargo laptop.

14.     To ensure that all components of the PayCargo platform could be replicated, Pasha sought the advice of his wife, Lauri, who is a computer programmer under the employ of Morgan Stanley. Lauri was exposed to the Trade Secrets and contributed to the replication of the PayCargo platform.

15.     In an effort to negotiate a salary increase, on or about July 23, 2018, Pasha tendered his resignation to purportedly "start [his] Cyber Security practice by Sept 1st, 2018." Instead of offering a salary increase, PayCargo accepted Pasha's resignation.

16.     On August 12, 2018, after Pasha unilaterally removed an authorized individual's access to the PayCargo system, Pasha was instructed to transfer, among other things, his system access and credentials to the individual authorized by PayCargo in anticipation of Pasha's impending departure from PayCargo.

17.     Pasha refused to transfer his access credentials to the authorized individual.

18.     Pasha's refusal led to the immediate termination of his employment on or about August 15, 2018.

3

**CONFIDENTIAL**                                              **PG 1036**

19.    The following day, despite being terminated and expressly told to refrain from accessing the system in any way, Pasha continued to access the PayCargo system. This prompted an August 16, 2018 cease and desist letter demanding such unauthorized access immediately cease.

20.    Prior to Pasha's departure from PayCargo, Pasha co-founded a company called WhiteHack, LLC, which purports to offer the service of hacking into its customers websites for the purpose of exposing vulnerabilities.

21.    On August 22, 2018, upon discovering that Pasha had been operating a business in during his time at PayCargo, PayCargo sent Pasha another cease and desist letter demanding he immediately stop using the PayCargo name and trademark in connection "WhiteHack Lab."

22.    In particular, PayCargo took issue with the fact that Pasha included false references/testimonials that purported to be from PayCargo, as well as certain defamatory claims about the PayCargo system.

23.    On August 27, 2018, PayCargo sent Pasha another letter demanding access credentials to PayCargo's AWS (Amazon Web Services) Management Console account which, housed the PayCargo development environment, and which Pasha had set up using his personal AWS account while under the employ of PayCargo. PayCargo was not able to convince Pasha to turn over the demanded credentials, but ultimately, PayCargo's IT team was able to transfer the IP back into an account that was under the control of PayCargo.

24.    On September 11, 2018, PayCargo sent Pasha another demand letter that included a draft affidavit that essentially asked Pasha to confirm that he had complied with PayCargo's demands to delete any and all confidential and proprietary information on his personal computer, as well as to reaffirm his obligation of confidentiality.

25.    Pasha refused to sign this affidavit.

4

26.     On July 18, 2019, PayCargo filed two lawsuits against its primary competitor, CargoSprint, LLC ("CargoSprint").

27.     In the Southern District of Florida, PayCargo sued CargoSprint and its principal, Joshua Wolf, for essentially trademark infringement and misappropriation of trade secrets. *PayCargo, LLC v. CargoSprint, LLC, et al.*, Case No. 1:19-cv-22995 (S.D. Fla.) (the "Florida Litigation").

28.     The trademark infringement claims pertain to CargoSprint's use of the name "PayAirCargo."

29.     The trade secret claims pertained to CargoSprint and Wolf's initially posing as a customer in the PayCargo system in order to reverse engineer their own competing payment processing system called SprintPay.

30.     In another case filed in the Northern District of Georgia, PayCargo is suing CargoSprint and Joshua Wolf under antitrust law for an illegal tying arrangement for SprintPay being illegally tied to SprintPass (a warehouse management system). *PayCargo, LLC v. CargoSprint, LLC, et al.*, Case No. 3:19-cv-00085 (N.D. Ga.) (the "Georgia Litigation").

31.     Between these two cases, there is substantial litigation between PayCargo and CargoSprint.

32.     Although based in Georgia, CargoSprint and Wolf operate primarily out of Guadalajara, Mexico.

33.     In the Florida Litigation, PayCargo dismissed its trade secret claims, without prejudice, on June 2, 2020.

34.     Recently, Pasha booked a trip for a two-night stay in Guadalajara, Mexico for July 3, 2020 through July 5, 2020.

5

35.     Contemporaneously, CargoSprint has been announcing an impending release of a new version of SprintPay.

36.     Pasha is booking a trip to Guadalajara, in the middle of a pandemic, to meet with CargoSprint and Joshua Wolf, who have historically shown a willingness to reverse engineer the PayCargo system, so that Pasha may market his knowledge of the PayCargo system, the Trade Secrets and other confidential information.

37.     This violates Pasha's statutory, contractual, and common law duties to preserve the confidentiality of the Trade Secrets.

38.     Plaintiff has retained the undersigned counsel to bring this action and has agreed to pay for reasonable attorneys' fees and costs incurred.

39.     All conditions precedent to the filing of this action have occurred or have been performed, waived, satisfied or excused.

**COUNT I**
**MISAPPROPRIATION OF TRADE SECRETS**
**18 U.S.C. § 1836(b)**
(Against Pasha)

40.     PayCargo re-alleges and incorporates by reference paragraphs 1-39 as if fully set forth herein.

41.     PayCargo owns all right title and interest in the Trade Secrets.

42.     The Trade Secrets constitute trade secrets within the meaning of 18 U.S.C. § 1839(3) as they are types of business, technical information, engineering information, patterns, formulas, techniques, procedures, programs, and codes PayCargo has taken reasonable measures to keep secret.

43.     PayCargo derives economic value from the Trade Secrets as they are not generally known to, and not readily ascertainable by, other persons who may be able to obtain economic

6

value from the disclosure or use of the Trade Secrets within the meaning of 18 U.S.C. § 1839(3)(B). Further, the Trade Secrets are used and intended for use in interstate and foreign commerce.

44.     Pasha knew, or had reason to know that he acquired the Trade Secrets by improper means, and/or disclosed or used those trade secrets without PayCargo's express or implied consent.

45.     Pasha has used and continue to use the misappropriated PayCargo Trade Secrets for their own benefit.

46.     As a result of Pasha's actions, PayCargo has suffered damages, and will continue to suffer irreparable injury.

47.     Such preliminary injunction should be sufficient in scope and effect so as to prevent any actual or threatened misappropriation and on such terms reasonable to prevent the Defendants from further misappropriation.

48.     Pasha's conduct was willful and malicious, with disregard for PayCargo's rights, so as to justify an award of attorneys' fees under 1836(b)(3)(D).

49.     Pasha's conduct requires the Pasha to pay damages to PayCargo for (i) PayCargo's actual loss caused by the misappropriation of PayCargo's trade secrets and (ii) damages for any unjust enrichment caused by Pasha's misappropriation of PayCargo's trade secrets.

WHEREFORE, PayCargo, LLC demands a judgment be entered against Pavel Galbreath a/k/a Pasha Galbreath a/k/a Pasha Probiv for the full amount of its actual damages, all applicable prejudgment and postjudgment interest, damages for any unjust enrichment experienced by Pasha, disgorgement of profits, reasonable royalties, exemplary damages, injunctive relief, a seizure order, an award of attorney's fees and costs, and any other relief which the Court deems just and proper.

7

## COUNT II
## CONVERSION OF CONFIDENTIAL AND PROPRIETARY INFORMATION
(Against Pasha)

50.     PayCargo re-alleges and incorporates by reference paragraphs 1-39 as if fully set for herein.

51.     Pasha knowingly, willfully, unlawfully, and with intent to steal, commit an act of conversion of PayCargo's Trade Secrets .

52.     Pasha's acts of conversion were committed with the intent to permanently, or for an indefinite time, deprive PayCargo of its rightful possession, access to and use of the converted property, and to deprive PayCargo of the value of converted property.

53.     As a direct and proximate result of Pasha's conduct, PayCargo has suffered the deprivation of its property.

54.     Pasha's actions have interfered with PayCargo's enjoyment of its ownership rights over the converted property, over which Pasha has improperly exercised acts of dominion and control.

55.     As a direct and proximate result of the Pasha's conduct, PayCargo has suffered and will continue to suffer damages.

WHEREFORE, PayCargo, LLC demands a judgment be entered against Pavel Galbreath a/k/a Pasha Galbreath a/k/a Pasha Probiv for the full amount of its actual damages, all applicable prejudgment and postjudgment interest, an award of costs, and any other relief which the Court deems just and proper.

8

### COUNT III
### BREACH OF CONTRACT
(Against Pasha)

56.  PayCargo re-alleges and incorporates by reference paragraphs 1-39 as if fully set for herein.

57.  PayCargo and Pasha entered into a contract in the form of the Employment Agreement attached as **Exhibit A**.

58.  Pasha has breached the Employment Agreement by retaining the Trade Secrets and by disclosing them to CargoSprint, LLC, a competitor of PayCargo.

59.  Pasha's breach of the Employment Agreement was material.

60.  PayCargo was damaged as a result of this breach.

WHEREFORE, PayCargo, LLC demands a judgment be entered against Pavel Galbreath a/k/a Pasha Galbreath a/k/a Pasha Probiv for the full amount of its actual damages, all applicable prejudgment and post judgment interest, an award of attorney's fees and costs, injunctive relief, and any other relief which the Court deems just and proper.

### COUNT IV
### AIDING AND ABETTING DISCLOSURE OF TRADE SECRETS
(Against Lauri)

61.  PayCargo re-alleges and incorporates by reference paragraphs 1-39 as if fully set for herein.

62.  As explained above, Pasha has disclosed the Trade Secrets to CargoSprint in violation of his duties under statute, contract and common law.

63.  Lauri has knowingly aided and abetted this conduct.

64.  Lauri was award of Pasha's responsibilities to maintain the secrecy of the Trade Secrets.

9

65.    Lauri provided Pasha with substantial assistance and encouragement of Pasha's conduct by explaining to Pasha the financial components necessary to replicate the PayCargo platform, as well as educating him on the potential value of the Trade Secrets and encouraging Pasha to market his knowledge to PayCargo's competitor, CargoSprint.

WHEREFORE, PayCargo, LLC demands a judgment be entered against Lauri Galbreath for the full amount of its actual damages, all applicable prejudgment and postjudgment interest, damages for any unjust enrichment experienced by Pasha, disgorgement of profits, reasonable royalties, exemplary damages, injunctive relief, a seizure order, an award of attorney's fees and costs, and any other relief which the Court deems just and proper.

## COUNT V
## TRADEMARK INFRINGEMENT
(Against Pasha and WhiteHack)

66.    PayCargo re-alleges and incorporates by reference paragraphs 1-39 as if fully set for herein.

67.    PayCargo has three registered trademarks as follows:

| Mark | Registration No. | Registration Date | 15 U.S.C § 1065 Status |
|------|------------------|-------------------|------------------------|
| PAYCARGO | 3,519,112 | October 21, 2008 | Incontestable |
| ➤PayCargo | 3,900,069 | January 4, 2010 | Incontestable |
| PAYCARGO | 3,347,315 | December 4, 2007 | Incontestable |

68.    Each of these trademarks have achieved "incontestable" status.

69.    Pasha and WhiteHack willfully infringed upon these trademarks by placing the trademarks on the WhiteHack website.

10

**CONFIDENTIAL**

70.    PayCargo is entitled to the full panoply of remedies available under the Lanham Act.

WHEREFORE, PayCargo, LLC demands a judgment be entered against Pavel Galbreath a/k/a Pasha Galbreath a/k/a Pasha Probiv and WhiteHack, LLC for the full amount of its actual damages, statutory damages, disgorgement of profits, all applicable prejudgment and post judgment interest, an award of attorney's fees and costs, injunctive relief, and any other relief which the Court deems just and proper.

**COUNT VI**
**UNFAIR COMPETITION – FALSE DESIGNATION OF ORIGIN**
(Against Pasha and WhiteHack)

71.    PayCargo re-alleges and incorporates by reference paragraphs 1-39 as if fully set for herein.

72.    PayCargo has three registered trademarks as follows:

| Mark | Registration No. | Registration Date | 15 U.S.C § 1065 Status |
|------|------------------|-------------------|------------------------|
| PAYCARGO | 3,519,112 | October 21, 2008 | Incontestable |
| ➤PayCargo | 3,900,069 | January 4, 2010 | Incontestable |
| PAYCARGO | 3,347,315 | December 4, 2007 | Incontestable |

73.    Each of these trademarks have achieved "incontestable" status.

74.    By placing the trademarks on the WhiteHack website, Pasha and WhiteHack suggested to its potential customers that they were somehow affiliated, sponsored, endorsed, licensed, or related to PayCargo, when they are not.

11

**CONFIDENTIAL**                                          **PG 1044**

75.   This unauthorized use of PayCargo's trademarks has caused confusion among actual and/or potential customers of PayCargo as to the origin, sponsorship or approval of Pasha and WhiteHack's goods and services.

76.   Pasha and WhiteHack's actions are in violation of 15 U.S.C. § 1125(a) in that they have used, in relation to commercial activities, a false designation of origin, or a false or misleading description that is likely to cause confusion, and to cause mistake, and to deceive, as to the affiliation, connection, or association of Pasha and WhiteHack with PayCargo.

WHEREFORE, PayCargo, LLC demands a judgment be entered against Pavel Galbreath a/k/a Pasha Galbreath a/k/a Pasha Probiv and WhiteHack, LLC for the full amount of its actual damages, statutory damages, disgorgement of profits, all applicable prejudgment and post judgment interest, an award of attorney's fees and costs, injunctive relief, and any other relief which the Court deems just and proper.

## DEMAND FOR JURY TRIAL

PayCargo, LLC hereby demands a trial on all issues so triable.

DATE: July_____, 2020.

Respectfully submitted,
XANDER LAW GROUP, P.A.
One NE 2nd Avenue, Suite 200
Miami, Florida 33132
Tel: (305) 767-2001
Fax: (855) 926-3370
wayne@xanderlaw.com
*Attorneys for Plaintiff*

By: ___/s/Wayne R. Atkins_____
WAYNE R. ATKINS
Fla. Bar No.: 84000

12

**CONFIDENTIAL**                    **PG 1045**

# EXHIBIT A

CONFIDENTIAL

## EMPLOYEE AGREEMENT

This Agreement is between the undersigned employee ___PAVEL GALBREATH___("Employee") and **PayCargo, LLC**, or its affiliates for which Employee performs services or may perform services in the future (hereinafter individually and collectively referred to as the "Company").

In consideration of the Company's agreement to employ me and to provide me Trade Secrets and/or Confidential Information, I agree as follows:

1.        Ownership and Assignment of Intellectual Property. By signing below, I hereby assign and agree to assign, free of any obligation whatsoever, to the Company as well as its or their successors, assigns, or nominees, my entire right, title and interest in any developments, designs, patents, inventions and improvements, trade secrets, trademarks, service marks, corporate names, domain names, copyrightable subject matter (collectively, "Intellectual Property"), or proprietary information which I have made, or may make, in whole or in part, and either solely or jointly with others, while I am employed by the Company and/or with the use of the time, material or facilities of the Company, and/or resulting from any tasks assigned to me or work performed by me for or on behalf of the Company.

I further agree that, without charge to the Company, but at its expense, I will promptly execute and deliver all further documents (including but not limited to original applications and applications for renewal, extension or reissue of patents, trademark or service mark registrations or copyright registrations, in any country), and perform all lawful acts, as may be necessary to vest all rights, title and interest thereto in the Company, its successors, assigns, or nominees. The foregoing obligation to provide documents extends beyond any termination of my employment.

I also declare that to the best of my knowledge, I do not now own or claim any Intellectual Property or proprietary information relating to the business of the Company other than the Intellectual Property specifically identified and listed on an attachment to this Agreement.

2.        Nondisclosure of Trade Secrets and Confidential Information. I recognize and acknowledge that in the course of my employment, the Company will provide me Trade Secrets and Confidential Information (as defined below) belonging to the Company as well as the Company's customers, vendors or other third parties including entities with which the Company does business. Trade Secrets includes but is not limited to: a) any data or information that is competitively sensitive or commercially valuable and not generally known by the public; b) any scientific or technical information, design, process, procedure, formula, or improvement, computer software, object code, source code, specifications, inventions, systems information, whether or not patentable or copyrightable. Confidential Information means any data or information and documentation, other than Trade Secrets, which is valuable to the Company, its customers, vendors or other third parties and not generally known to the public.

I agree that for so long as the pertinent information or documentation remains a Trade Secret, I will not use, disclose, or disseminate to any other person, organization, or entity or otherwise employ any Trade Secrets. I further agree that during my employment and after the cessation of my employment with the Company, I will not use, disclose or disseminate to any other person, organization, or entity or otherwise employ any Confidential Information. The obligations set forth herein do not apply to any Trade Secrets or Confidential Information which becomes generally known to competitors of the Company through no act or omission of me. In addition, the obligations set forth herein shall not apply to disclosures made pursuant to the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7245, nor prohibit me from disclosing to other employees (excluding competitors and future employees) information about my compensation or my working conditions or to apply to disclosures made as required by law.

I acknowledge my responsibility as a user of the Company computer system. I will not share my password with any other users. I understand that I am accountable for all access made by my logon ID (user ID) and that this logon may be revoked and appropriate steps may be taken if it is abused.

3.        Records. Upon any termination of my employment or at any time the Company requests, I agree to immediately turn over to the Company all Company materials and Trade Secrets and Confidential Information, and all

copies thereof (including without limitation all documents, papers, computer files, reports or other material in my possession or under my control which may contain or be derived from Trade Secrets, Confidential Information and/or Intellectual Property, together with all documents, notes, records, drawings, manuals, or other work products which are connected with or derived from my employment activities for the Company.)

4.    Third Party Agreements and Code of Conduct.  I agree to abide by the terms and conditions of software license, non-disclosure, and confidentiality agreements entered into by the Company ("Third Party Agreements").  In addition, I acknowledge that I have received a copy of the Company's Code of Conduct and agree to abide by the terms outlined in that document.

5.    Injunctive Relief.  I acknowledge that breach of any of the terms of this Agreement or any "Third Party Agreements" may give rise to irreparable injury to the Company, its customers or suppliers, or other third parties.  I also agree that such injury would be inadequately compensated by money damages alone.  Accordingly, the Company, or, where appropriate, affiliates, customers or suppliers of the Company, may seek and obtain injunctive relief in addition to any other legal remedies which may be available.

6.    Prior Employer.  I represent that my performance as an employee of the Company will not breach any employment agreement or any agreement to keep in confidence the trade secrets, confidential or proprietary information of a former employer.  I have not brought any trade secrets, confidential or proprietary information of a former employer to the Company.  I will not disclose or use in the performance of my work with the Company any trade secrets, confidential or proprietary information of a former employer unless I have obtained written authorization from the former employer.

7.    New or Prospective Employers.  In the event that I seek or am contacted by new or prospective employers other than the Company, I agree that I will affirmatively reveal the existence of the Employee Agreement to said new or prospective employers.

8.    Non-Solicitation of Employees.  Both during employment with the Company and for twelve (12) months after the cessation of employment with the Company, I will not recruit, or attempt to recruit or hire, directly or by assisting others, any other employee of the Company with whom I had contact or about whom I learned Trade Secrets or Confidential Information during my last twenty-four (24) months of employment with the Company.  For the purposes of this paragraph "contact" means any business-related interaction between me and the other employee.

9.    Non-Solicitation of Business.  I agree that while employed by the Company, I have had and will have contact with and have become and will become aware of the Company's customers and the representatives of those customers, their names and addresses, specific customer needs and requirements, and leads and references to prospective customers, and that I have benefited and added and will continue to benefit and add to the Company's goodwill with its customers and in the marketplace generally. I further agree that loss of such customers will cause the Company significant and irreparable harm.

I agree that, for twelve (12) months after the cessation of my employment with the Company, I will not solicit, contact, call upon, or attempt to solicit any customer, prospective customer, or customer referral source of the Company for the purpose of providing any products or services substantially similar to those I provided while employed with the Company.  This restriction applies only to any customer, prospective customer, or customer referral source of the Company with whom I had contact or about whom I learned Trade Secrets or Confidential Information during the last twenty-four (24) months of my employment with Company.  For purposes of this paragraph, "contact" means interaction between me and the customer, prospective customer, or customer referral source which takes place to further the business relationship, or making sales to or performing services for the customer, prospective customer, or customer referral source on behalf of the Company.  As used in this paragraph, a "customer referral source" is any entity with which the Company has entered into agreement (or is seeking to enter into such agreement) with to refer customers to Company.

10.    Employment at Will.  I understand and agree that my employment with the Company is terminable at the will of either the Company or myself.  I may terminate my employment at any time with or without notice and the Company has similar right.  There are no representations or promises that employment will

continue for any set period of time, nor are there any representations or promises that employment will be terminated only under particular circumstances. I acknowledge that no representations, express or implied, may be made which are inconsistent with this policy and no one other than an officer of the Company is authorized to make representations, express or implied, inconsistent with the policy.

11.    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware (without regard to its conflict of laws provisions) and may be modified only by a written agreement signed by the Company and me.

12.    Severability. The various parts of this Agreement are intended to be severable. Should any part be rendered or declared invalid by reason of any legislation or by a decree of a court of competent jurisdiction, such part shall be deemed modified to the extent required by such legislation or decree and the invalidation or modification of such part shall not invalidate or modify the remaining parts of the Agreement.

13.    Computer Access and Systems. I hereby understand that all Company computing platforms, associated systems, and data are considered for internal-use-only and not for personal use. In addition, all user identifiers and passwords are considered Confidential Information and unauthorized disclosure and use may result in disciplinary action. I understand all Company systems are controlled and unauthorized access into these systems is considered a criminal offense and may result in disciplinary action and prosecution.

14.    General. This Agreement is not intended to replace or negate any other agreement(s) I have entered into or may enter into with the Company, but is intended to be in addition to them. The provisions of this Agreement shall survive any termination of my employment. In addition, I understand and agree that should I become employed by another entity owned or otherwise affiliated with PayCargo, LLC (such as its divisions or unincorporated affiliates), the obligations of this Agreement follow me to such other entity automatically and without further action, and that entity becomes "Company" within the meaning of this Agreement.

I, the undersigned, understand and agree to the above terms of the Agreement.

Signature: _____

Printed Name: _____ Pavel GALBREATH

Date: _____ 8/30/2017